AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court

### for the
### Western District of New York

**United States of America**

v.

**RICHARD TEPLITSKY**

_____

*Defendant*

Case No. 26-mj- 5127
(SEALED)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

Beginning no later than in or about 2018 and continuing through in or about March 2026, in the Western District of New York and elsewhere, the defendant did:

(1) with intent to defraud, devise a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing or attempting to execute the scheme and artifice to defraud, knowingly cause to be delivered in the mail matters and things according to the direction thereon, in violation of Title 18, United States Code, Section 1341; and

(2) devise and intend to devise a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations and promises, and, for the purpose of executing such scheme and artifice to defraud, transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals and sounds, in violation of Title 18, United States Code, Section 1343.

This Criminal Complaint is based on these facts:

☒ Continued on the attached affidavit.

_____
*Complainant's signature*

JOSHUA SIBENIK
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION
*Printed name and title*

Sworn to telephonically on
this 20th day of April, 2026

_____
*Judge's signature*

HON. MICHAEL J. ROEMER
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

City and State:  Buffalo, New York

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

STATE OF NEW YORK  )
COUNTY OF ERIE         )  SS:
CITY OF BUFFALO       )

I, Joshua Sibenik, being duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since May of 2017.  I am currently assigned to the FBI's Buffalo Division and to the White-Collar Crime Squad within that office.  Prior to this, I was assigned to the FBI's San Juan Division, where I investigated crimes relating to public corruption.  I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18 of the United States Code.

2.      I make this Affidavit in support of a Criminal Complaint charging RICHARD TEPLITSKY ("TEPLITSKY") with mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343.

3.      I have knowledge of the facts set forth in this Affidavit from my own investigation and from discussions with and review of reports of other law enforcement officers and witnesses.  Because this Affidavit is submitted for the purpose of establishing probable cause to support the issuance of a Criminal Complaint and Arrest Warrant, I have not included every fact known by the government concerning this investigation.

## PROBABLE CAUSE

4.      The information set forth below establishes probable cause to believe that TEPLITSKY committed:

(i) mail fraud, in violation of Title 18, United States Code, Section 1341, in that, with intent to defraud, he devised a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing or attempting to execute the scheme and artifice to defraud, he knowingly caused to be delivered in the mail by the United States Postal Service matters and things according to the direction thereon; and

(ii) wire fraud, in violation of Title 18, United States Code, Section 1343, in that he devised and intended to devise a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing the scheme and artifice, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds.

5.  At all relevant times, TEPLITSKY resided in the Western District of New York and served as the president of Woodhill Capital Corp. ("Woodhill").

6.      Woodhill was a corporation formed in New York State in 1984.  It maintained an office in Williamsville, New York.

2

7.    As president of Woodhill, TEPLITSKY and other Woodhill personnel would solicit funds from investors within the Western District of New York and elsewhere. TEPLITSKY represented to investors that their funds would be used to finance loans to businesses that were seeking to borrow money to acquire commercial equipment.

8.    When investors provided funds to Woodhill for loans, TEPLITSKY would provide investors with copies of equipment financing agreements and amortization schedules reflecting loan repayments from the borrowers. The investors would receive payments from Woodhill pursuant to the amortization schedules. The payments were typically made by check delivered in the mail by the United States Postal Service or by electronic transfers through the Automated Clearing House ("ACH").

### Victim-Investors

9.    As part of this investigation, FBI has interviewed the following investors, among others.[1]

10.    Victim 1, a male individual residing in the Western District of New York, began investing with Woodhill in 2018. Victim 1 initially dealt with a Woodhill sales manager until the sales manager's death in December of 2023. Upon the death of the sales manager, Victim 1 began dealing exclusively with TEPLITSKY.

---

[1] As set forth herein, Woodhill received funds from numerous investors. The FBI is continuing to interview investors and review financial records pertaining to their investments.

3

11.     Victim 1 provided an example of how he typically invested money with Woodhill:   TEPLTISKY would identify an interested borrower and inform Victim 1 by text message that there was an investment opportunity for a certain amount of money with an identified borrower at a specified interest rate.   Victim 1 would agree to the details and drop off a check for that amount of money to TEPLITSKY at Woodhill's office.   Victim 1 would later receive a packet of documents from TEPLITSKY including the Equipment Financing Agreement ("EFA") between Woodhill and the borrower which listed the loan amount, the term, the equipment identification number listed as collateral, and the monthly payment to be paid by the borrower to Woodhill.   Victim 1 would also receive an amortization payment schedule to include principal and interest.   Victim 1 stated that he had approximately 15 current investment loans like this with various businesses through Woodhill at different terms and interest rates.   Every month, Woodhill would send Victim 1 a monthly statement detailing his loans, the number of payments remaining, and the outstanding receivables. Since 2018, Victim 1 had consistently received his monthly payments from Woodhill by check in the mail delivered by the United States Postal Service or by electronic ACH transfer, until March 2026.

12.     When Victim 1 failed to receive his payments in March 2026, he attempted to contact TEPLITSKY but was unsuccessful.   Victim 1 contacted several other investors and they informed him that they also had not received their March monthly payment.   On March 18, 2026, Victim 1 sent a certified letter to the borrowers of Victim 1's loans directing them to pay him instead of Woodhill.   Approximately 3-4 borrowers responded to Victim 1 claiming

4

that they did not have a loan with Woodhill, that the amount of the loan was incorrect, or that it was not their signature on the equipment financing agreement. Victim 1 advised that he had approximately $873,000 invested with Woodhill.

13. One of the borrowers Victim 1 contacted was Borrower A. Borrower A is a male individual who owns a business located in Pennsylvania. Victim 1 had received an EFA from Woodhill indicating that the loan with Borrower A was in the amount of $45,000 with a term of 48 months. The EFA also indicated that the collateral for the loan was a 2008 Peterbilt truck with a Vehicle Identification Number ("VIN") ending in 41153. The EFA bore what appeared to be the signature of Borrower A. Upon being interviewed by FBI, Borrower A advised that in the past he had purchased trailers that were financed through Woodhill, but not a 2008 Peterbilt truck. He stated he does own a 2006 Peterbilt truck, but it was financed through his local bank, not through Woodhill. Borrower A also confirmed that he had not signed the EFA that Woodhill had provided to Victim 1.

14. Victim 2 is a male individual residing in the Western District of New York. Victim 2 advised that he had been an investor in Woodhill for a few years, probably less than five. Victim 2 was introduced to TEPLITSKY by a friend who had been an investor in Woodhill for many years. TEPLITSKY would contact Victim 2 by telephone, email, text, and possibly by in-person meeting on a couple occasions. TEPLITSKY would tell Victim 2 about opportunities to make certain loans and would inquire whether Victim 2 was interested in funding those loans in return for a fixed rate of return. Victim 2 would invest by providing

5

a check to TEPLITSKY and believed he always met with TEPLITSKY to hand the check personally to him. TEPLITSKY would provide Victim 2 with documentation of the loan made to the borrower, an amortization schedule, and an assignment of the loan to Victim 2. Victim 2 received checks from Woodhill representing payments of principal and interest on the loans Victim 2 had funded. These checks were generally mailed to Victim 2, although around February 2026, Victim 2 arranged with TEPLITSKY for those payments to be made by electronic transfer to Victim 2's bank account. Victim 2 received payments from Woodhill twice a month, once on the 10th of the month and once on the 20th or 25th of the month. Prior to March 2026, Woodhill never missed any of these payments to Victim 2.

15.    Upon learning in March of 2026 that Woodhill might not be making any further payments, Victim 2 contacted borrowers on some of the loans which he believed his investments had funded. Victim 2 advised that he had contacted Borrower A, referenced above. Borrower A confirmed that he owned a trailer with the same VIN that appeared on an EFA that Victim 2 had received from Woodhill. However, that trailer was a 2009 trailer, not a 2019 trailer as stated on Victim 2's EFA. Furthermore, Borrower A had financed the purchase of the 2009 trailer for $15,552, not $46,552 as stated on Victim 2's loan documents. When FBI interviewed Borrower A, he confirmed that what appeared to be his signature on Victim 2's EFA from Woodhill was not his genuine signature. Victim 2 said that as of March 2026, he had approximately 10 loans with Woodhill and approximately $380,000 in interest and in principal due to him.

6

16.    Victim 3, a male individual residing in the Western District of New York, became an investor with Woodhill in March of 2021, when he dropped off his first check in person to TEPLITSKY at Woodhill's office.    When Victim 3 first started investing with Woodhill, he dropped off physical checks, but after a few years, he would text TEPLITSKY an image of a check when he wanted to invest in a loan.    Victim 3 started at a 13% rate of return, but about 6 to 12 months ago, it went up to 15%.    Victim 3 always received his monthly payment from Woodhill with a statement detailing the amount of loans he had, the payments made, and the remaining receivables. The last payment Victim 3 received from Woodhill was on March 11, 2026.    Victim 3 received payments from Woodhill via check delivered in the mail.    Victim 3 has approximately $269,962.40 in outstanding principal still invested with Woodhill.

17.    Victim 3 made his most recent investment with Woodhill in December 2025. The investment supposedly funded a loan to Borrower B, a male individual who owns a business located in New York.    FBI has interviewed Borrower B.    He advised he had never received any loans from Woodhill.

18.    Victim 4, a female individual residing in the Western District of New York, began investing with Woodhill approximately 12 years ago.    Victim 4 initially dropped off checks to a sales manager at Woodhill when she wanted to make an investment, but when the sales manager passed away a few years ago, she began texting TEPLITSKY images of her checks when she made an investment.    When Victim 4 made her last two investments, she

7

texted TEPLITSKY an image of her checks and she received the loan documentation via text message from TEPLITSKY.  Victim 4 received payments for at least the last 12 months via ACH electronic transfers into her bank account.  The last payment that Victim 4 received was on March 10, 2026.  Victim 4 still had approximately $184,923.62 in principal invested with Woodhill.

19.    The last investment Victim 4 made was a loan in October 2025 to Borrower B. Victim 4 texted a picture of a check to TEPLITSKY in the amount of $41,942.84 with the memo line referencing Borrower B.  TEPLITSKY had texted Victim 4 an EFA with Borrower B as the borrower of a loan for $41,942.84.  When FBI interviewed Borrower B, he stated that he had never received a loan from Woodhill.  He had applied for a loan through Woodhill in September 2025 but was denied.  Borrower B confirmed that his correct business information was listed on Victim 4's EFA, but the signature on the EFA was not his genuine signature and the equipment listed in the EFA was not the equipment he had sought to finance.

20.    Victim 5, the son of Victim 4, also residing within the Western District of New York, began investing with Woodhill approximately 18 months ago and had three investments with Woodhill.  TEPLITSKY offered Victim 5 about five or six loans to invest in, and Victim 5 chose three of them.  Victim 5 always communicated with TEPLITSKY via email and sent pictures of his checks for each investment to TEPLITSKY via email. TEPLITSKY sent the EFAs and the amortization schedules to Victim 5 via email.  Victim 5

8

received his payments from Woodhill via ACH electronic transfer. The last payment he received was on March 10, 2026. Victim 5 still had approximately $76,192.36 in principal invested with Woodhill.

21.     One of Victim 5's investments supposedly was a loan for $40,374.76 to Borrower C, a male individual who owns a business located in Texas. Victim 5 had emailed a check to TEPLITSKY with Borrower C referenced on the memo line on the check. According to the amortization schedule for the loan, the payments by Borrower C were to begin in December 2024. FBI interviewed Borrower C. He said that he had received two loans from Woodhill, but the most recent loan was in October 2023. The EFA that Victim 5 received from TEPLITSKY for Borrower C identified the equipment being acquired as a 2017 Vant Trailer with a VIN ending in A1727. Borrower C confirmed that this was the VIN from one of Borrower C's previous loans with Woodhill, but it was for a 1997 Vant Trailer (not a 2017 trailer), the loan was for only $6,000 (not $40,374.76), and the loan was paid off by December 2024.

### Consensual Interview of TEPLITSKY

22.     As part of its investigation, FBI has conducted a consensual interview of TEPLITSKY. During the interview, TEPLITSKY advised that Woodhill's business involved providing loans to borrowers to finance the acquisition of equipment, largely of trucks and trailers.

9

23.    TEPLITSKY estimated that over the life of Woodhill, the average amount of loans provided to borrowers ranged from $10,000 to $50,000.  Woodhill would provide the loan proceeds directly to the seller of the equipment being acquired by the borrower.  The typical interest rate Woodhill charged borrowers was approximately 20 to 25 percent.

24.    TEPLITSKY stated that Woodhill would acquire money from investors to fund the loans to borrowers.  Sometimes investors would tell TEPLITSKY that they had a certain amount of money to invest, and TEPLITSKY would advise the investor that Woodhill had a borrower who was looking for a loan generally in that amount.  Other times, TEPLITSKY would contact investors and represent that Woodhill had a borrower that was looking for a loan in a certain dollar amount and inquire if the investor was interested in funding the loan.

25.    TEPLITSKY stated that when investors provided money to Woodhill to fund a loan to a borrower, Woodhill would typically pay a 13 to 14 percent return to the investor.  Sometimes, the return percentage paid to the investor was higher.  Woodhill would set up a payment/amortization schedule whereby borrowers would make a monthly payment to Woodhill consisting of principal and interest.  Woodhill would, in turn, pay the investor. TEPLITSKY advised that Woodhill would make a monthly payment to the investor regardless of whether the borrower had made their monthly payment to Woodhill.

10

26.    In the past, Woodhill would send investors loan documents related to the loans that they funded.   At some point in time, TEPLITSKY advised that the number of investors grew so large that he fell behind in sending the loan documents.   TEPLITSKY also stated that the kind of high interest loans that Woodhill was making to borrowers were risky as far as their collectability.   TEPLITSKY estimated that the borrowers' default rate may have been around 50 percent.

27.    TEPLITSKY stated that at some point in time, probably around the mid-1990s, Woodhill did not have enough money coming in from borrowers to make the payments that were due to Woodhill's investors.   At that point, TEPLITSKY started to create fictitious loan documents fraudulently representing to investors that their money was being used to fund loans.   In fact, many of the funds being provided by investors were not being used to fund loans to borrowers, but instead were being used to pay the amounts owed to previous investors.

28.    TEPLITSKY advised that the number of fictitious loans he created to generate funds from investors increased over time, such that in approximately the last ten years most of Woodhill's loans have been fictitious.   TEPLITSKY advised that as of March 2026, there were approximately 170 to 190 investors with Woodhill who were owed tens of millions of dollars in principal and interest from loans that their money had funded.   Nevertheless, only about 5 to 10 percent of those loans were real, with the remaining loans being fictitious.

11

29.     TEPLITSKY advised that he typically sent payments to investors by mail.   He communicated with investors primarily by text message or by email.   Investors would often send him checks electronically via text message.

## CONCLUSION

30.     Based on the foregoing, it is respectfully submitted that there is probable cause to find that RICHARD TEPLITSKY has committed (i) mail fraud, in violation of Title 18, United States Code, Section 1341; and (ii) wire fraud, in violation of Title 18, United States Code, Section 1343.

31.     It is respectfully requested that the Court issue an Order sealing this Complaint, Affidavit, and Arrest Warrant, until further order of the Court.   Sealing is necessary because the premature disclosure of the contents of this Affidavit and the existence of an Arrest Warrant may compromise this ongoing investigation.

_____
JOSHUA SIBENIK
Special Agent
Federal Bureau of Investigation

Sworn to telephonically this
20th day of April 2026

_____
HONORABLE MICHAEL J. ROEMER
United States Magistrate Judge

12